Allard v. SSA             CV-13-82-JL                2/21/14

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Kellie Allard

    v.                                    Civil No. 13-cv-82-JL
                                          Opinion No. 2014 DNH 034
Carolyn W. Colvin,
Commissioner, Social Security
Administration

**SUMMARY ORDER**

    Kellie Allard has appealed the Social Security Administration's denial of her application for Supplemental Security Income ("SSI"), which claimed an onset date (as amended) of July 2, 2010. An administrative law judge at the SSA ("ALJ") ruled that, while Allard suffered from severe impairments (bipolar disorder, anxiety disorder, personality disorder, and obesity), she retained the residual functional capacity ("RFC") for sedentary work with specified limitations, allowing her to perform jobs that exist in the national economy in significant numbers and, as a result, is not disabled. See 20 C.F.R. § 416.905(a). The Appeals Council later denied Allard's request for review of the ALJ's decision, see id. § 416.1479, so the ALJ's decision became the SSA's final decision on DP's application, see id. § 416.1481. Allard appealed the decision to

this court, which has jurisdiction under 42 U.S.C. § 405(g) (Social Security).

Allard has filed a motion to reverse the decision, see L.R. 9.1(b)(1), challenging it as unsupported by substantial evidence. Specifically, Allard argues that the ALJ erred by (1) discrediting her claims of disabling symptoms, (2) giving little weight to the opinions of a nurse practitioner who treated Allard, and a psychologist who did not, and giving great weight to the opinion of a different non-treating psychologist instead, and (3) failing to consider the SSA's prior determination that Allard was, in fact, disabled.[1]  The Commissioner of the SSA has cross-moved for an order affirming the decision, see L.R. 9.1(d), defending the ALJ's findings.  As explained below, the court denies Allard's motion, and grants the Commissioner's.

---

[1] In a one-sentence footnote, Allard states that "nothing in the ALJ's decision or the [vocational expert's] testimony supports the finding that a total of three types of jobs with a total of 400 available positions to claimant represent a significant number of jobs within the regional economy, especially when one of the jobs is based upon available tourism." This argument is insufficiently developed to warrant the court's attention.  "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

1.      **Credibility of Allard's claimed symptoms**

Allard testified at the hearing that her "sleep is so erratic that I never know if I'm going to get a full night's sleep" or "sleep at all," causing her to "worry that I'm not going to get up on time" or "that I'll be tired all day."  Noting that Allard had "alleged disabling limitations because of erratic sleep and bipolar disorder," the ALJ found that Allard's "medically determinable impairments could reasonably be expected to cause the alleged symptoms."  The ALJ also found, however, that "the medical findings do not support the existence of limitations greater than" those incorporated in the ALJ's RFC determination, as well as that Allard's "statements concerning the intensity, persistent, and limiting effects of these symptoms are not credible to the extent they are inconsistent with [RFC] assessment."  Again, that assessment was that Allard retained the RFC to perform sedentary work so long as it was "limited to simple, repetitive . . . tasks, assuming normal work breaks over an eight hour day, where there is only simple decisionmaking or judgment required, where there is [*sic*] few, if any workplace changes, where there is no production rate or pace work, and where there is only occasional interaction with the public."

This ALJ's analysis of Allard's claimed sleep problems was consistent with SSR 96-7p, Titles II and XVI: Evaluation of

3

Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186 (S.S.A. 1996).  SSR 96-7p "outlines a specific staged inquiry that consists of the following questions, in the following order:  (1) does the claimant have an underlying impairment that could produce the symptoms he or she claims?; (2) if so, are the claimant's statements about his or her symptoms substantiated by objective medical evidence?; and (3) if not, are the claimant's statements about those symptoms credible?"  Scanlon v. Astrue, 2013 DNH 088, 11 (quotation marks omitted).  The ALJ properly followed this procedure in finding that Allard's testimony as to her sleep disturbances was not entirely credible.

>  Specifically, the ALJ found that
>
>  treatment notes [from Jennifer Ganem, a nurse
>  practitioner who treated Allard] revealed some
>  difficulty in sleeping at times [but] those
>  difficulties were short lived and attendant [to]
>  changes in [her] medications.  Overall, the record
>  reflects that [Allard] slept soundly for approximately
>  five hours a night.  Moreover, [she] stated to
>  examining physician John C. Gorman, MD of Nashua
>  Rheumatology that she sleeps well and feels refreshed
>  upon awakening while on Trazadone.

(record citations omitted).  Allard argues that the ALJ arrived at this conclusion only by "cherry-picking certain terms in the reports while ignoring [their] essence" or, as she describes it later in her motion, their "spirit."  In the court's view,

however, the ALJ acted within her discretion in rejecting, as not credible, Allard's statement that she was disabled by her erratic sleep, because there is substantial evidence--including, but not limited to, Ganem's treatment notes--to support that finding.

First, the ALJ fairly characterized Ganem's treatment notes. Allard saw Ganem on a regular basis (on average, every other month or so) for a roughly two-year span, between July 2009 and June 2011.  Each time, Allard reported she had been sleeping soundly for around 5 hours a night, with the exception of two periods:  consecutive visits in February and April 2010 and a series of four visits in February and March 2011.[2]  After this first period of sleep difficulty, however, Allard reported, in June 2011 (having not sought treatment from Ganem since March) that she had been "sleeping soundly" for around 5 hours a night, though she "continu[ed] to be tired."  Allard did not see or call Ganem again until September 2010, when she again reported 5 hours of sound sleep each night and made no complaint of fatigue. After the second period of sleep difficulty, Allard reported, in April 2011, that she had been "sleeping soundly" for at least 5 hours a night; while she also complained of feeling "tired all

---

[2]Allard also complained of trouble sleeping in telephone calls to Ganem at different times (in September 2009 and November 2010) but in each case, reported within several days that she had returned to sleeping soundly for around 5 hours each night.

5

day," at her next visit to Ganem, in May 2011, Allard described her sleep as both "sound" and "very nice."  So the ALJ supportably found that Ganem's notes reflected merely "some difficulty in sleeping at times" and that, in general, Allard "slept soundly for approximately five hours a night."

Second, the ALJ also accurately found that Allard had told John Gorman, a rheumatologist she visited in late May 2011, that "she sleeps well on the trazadone"--one of the drugs, she reported, that had "straightened out" her bipolar disorder--and that she "feels refreshed upon awakening" (though she also reported "variable [morning] stiffness and daytime fatigue").  Of course, "[o]ne strong indication of the credibility of an individual's statements is their consistency . . . with other information in the case record . . . .  Especially important are statements made to treating or examining medical sources."  SSR 96-7p, 1996 WL 374186, at *5.  Yet Allard's motion does not meaningfully address the ALJ's reliance on the report of the visit to Gorman.[3]

---

[3]Allard states, without further exposition, that the report "specifically notes that [Allard] suffers from *daytime fatigue*." Gorman, however, attributed the fatigue to fibromyalgia, not to sleep disturbances (in a finding Allard does not question, the ALJ treated fibromyalgia as a non-severe impairment because "the record fails to show that [Allard] receives any ongoing treatment for [it]").  So Gorman's notation of Allard's complaint of daytime fatigue does not undermine the ALJ's finding that

6

Third, the ALJ also found that, in Allard's testimony at the hearing, she had "described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." In particular, the ALJ noted that Allard testified to driving, grocery shopping, cooking, sweeping, making the beds, and washing dishes and clothes, as well as to socializing with friends.[4] While Allard argues that this inaccurately characterizes her statements at the hearing, this argument relies principally on her testimony that her activities were more limited on what Allard called her "bad days," which she estimated to be three days every week.[5] The ALJ specifically addressed this testimony in her decision, however, noting that

---

Allard's claims of disabling sleep disturbances were not fully credible.

   [4]Allard correctly points out that she did not testify to making the beds and, in fact, stated that she did not because "[n]o one is going to see it." This error is insignificant in light of the other errands and chores, just listed, that Allard said she does (even if, as she now emphasizes, she testified that she does not do them all every single day).

   [5]Allard also argues that the ALJ ignored "the limitations faced by the claimant while driving . . . due to confusion and memory lapses caused by her medical conditions." Although Allard testified that, while driving, she "would sometimes draw a blank" as to her destination, she does not point to anything in the record attributing these "memory lapses" to her "medical conditions." Allard's occasional forgetfulness while driving, then, does not undermine the ALJ's reliance on Allard's driving as evidence that her allegations of disabling sleep disturbances and bipolar disorder were not fully credible.

7

this "limitation is not supported in the record and cannot be objectively verified with any reasonable degree of certainty." Allard does not question this reasoning in her motion.

The ALJ further observed that "Allard was apparently able to care for her thirteen year old daughter at home."  Allard argues that "nothing within the four corners of the ALJ's decision supports this finding," nor the conclusion that "living in a condominium with a thirteen year old daughter represents an activity of daily living inconsistent with the existence of a disabling condition."  But Allard herself testified that she lives, alone, with her 13-year old daughter, and that, while her daughter made herself breakfast and "was supposed to" do the dishes and the sweeping, Allard would "sometimes" wash the dishes, "usually" did the sweeping, and would also wash her daughter's clothes and drive her to basketball.  In fact, Allard described herself as "the maid."  Furthermore, the ALJ did not rely on the evidence of Allard's activities in caring for her daughter to find that Allard was not disabled, but, rather, to find that her complaints of disabling symptoms were not entirely credible.  That is an appropriate use of evidence of a claimant's daily activities.  See, e.g., Mason v. Astrue, 2013 DNH 013, 14. The ALJ did not err in assessing the credibility of Allard's claims of disabling symptoms.

## 2. Opinion evidence

Allard also argues that the ALJ improperly gave little weight to the opinions of Ganem, the nurse practitioner who treated Allard between June 2009 and July 2011, and Dr. Stephanie Lynch, a psychologist who examined Allard on behalf of the State of New Hampshire in December 2010. In December 2010, Ganem completed a "mental impairment questionnaire" about Allard. The questionnaire stated that Ganem had diagnosed Allard with bipolar II disorder with obsessive-compulsive disorder ("OCD") traits, identifying a number of signs and symptoms by checking off items from a pre-set list, and indicating a number of functional limitations by circling a degree of limitation in each of four categories.[6] Ganem checked a box indicating that Allard's "impairments or treatments" would "cause [her] to be absent from work . . . [m]ore than three times a month," and circled "yes" in response to the question, "Would your patient have difficulty working at a regular job on a sustained basis?" Ganem stated that Allard "has sleep disturbances during the night which cause

---

[6]In particular, Ganem indicated that Allard faced "continual episodes of decompensation or deterioration in work or work-like settings." The ALJ, however, gave little weight to this opinion, pointing out Ganem's lack of "further documentation of those episodes." In her motion, Allard does not point to any such documentation or otherwise question this finding, so the court has not scrutinized it.

9

her to be tired during the day." Later, in July 2011, Ganem wrote a letter "To Whom It May Concern" stating that, while she was treating Allard for her bipolar II disorder with OCD traits, Allard "continues to have moderate symptoms despite her treatment and remains unable to work at this time."

As an initial matter, the ALJ noted that Ganem "is a clinician who is not an acceptable medical source." That is correct, see 20 C.F.R. § 416.913(a), with the result that Ganem's views are not entitled to the deference reserved for "medical opinions." See Titles II and XVI:  Considering Opinions and Other Evidence From Sources Who Are Not "Acceptable Medical Sources" in Disability Claims, SSR 06-03p, 2006 WL 2329939, at *2 (SSA 2006). It is true that, as Allard points out, that opinions from so-called "other medical sources" like nurse practitioners "should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file," and the ALJ "generally should explain the weight given to opinions from these 'other sources.'" Id. at *3. But, as explained below, the ALJ did that here.

As the ALJ also noted, "[s]tatements that a claimant is . . . 'unable to work' . . . or the like are not medical opinions but are administrative findings . . . reserved to the Commissioner." That is also correct--such opinions have "no

special significance."  See 20 C.F.R. § 416.927(d)(3).
Nevertheless, the ALJ "must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner," and "must explain the consideration given to the treating source's opinion(s)." Social Security Ruling 96-5p, Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner, 1996 WL 374183, at *2-*3 (S.S.A. 1996).  But, again, the ALJ did that here.

First, the ALJ noted that Ganem's opinion is "not consistent with the weight of the evidence, particularly her own mental status examinations of" Allard.  In these examinations, the ALJ noted, Allard "consistently demonstrated calm, cooperative and easily engaging behavior, a euthymic mood, a full range of affect and appropriate eye contact.  Her speech was consistently normal and there was no evidence of a thought disorder or mania."  In her motion, Allard does not question the ALJ's characterization of the mental status examinations, nor their inconsistency with Ganem's opinions that Allard's symptoms would prevent her from working.  (As discussed above, Allard contests the ALJ's finding that Ganem's treatment notes failed to support her opinion that Allard's sleep problems disabled her from working, but that finding was supported by substantial evidence.)  Of course, one of the factors for the ALJ to consider in weighing opinion

evidence is its consistency with the record as a whole.  See 20 C.F.R. § 416.927(c)(4).

Second, the ALJ observed that Ganem's opinions "relied quite heavily on the subjective report of symptoms and limitations provided by" Allard, even though "there remain good reasons for questioning the reliability of [her] subjective complaints."  As just discussed, the ALJ supportably found that Allard's claims of disabling symptoms were not fully credible, and, in any event, an ALJ need not give great weight to opinions "that rely more on the claimant's subjective reports to [the physician] than they rely on [the source's] own observations or clinical findings."  Scanlon, 2013 DNH 088, 9 n.2.  The ALJ, then, provided the requisite "good reasons" for giving little weight to Ganem's opinions that Allard would "have difficulty working at a regular job on a sustained basis," would be absent from work "more than three times a month," and "remains unable to work"--which, after all, were merely the opinions of an "other medical source" on issues reserved to the Commissioner.

The ALJ also supportably found that the opinions of Dr. Lynch, the state agency psychologist, were entitled to little weight.  After examining Allard in December 2010, Lynch diagnosed her with bipolar disorder and anxiety disorder with panic attacks.  Lynch found that Allard could nevertheless communicate

effectively and interact appropriately with others in superficial social situations; concentrate on and persist to complete concrete tasks at a slow pace; and interact with supervisors in a calm and quiet schedule.  (Those findings, of course, are more or less consistent with the ALJ's RFC determination, and Allard does not argue to the contrary.)  Lynch also wrote, however, that she "did not believe that [Allard] would be able to maintain a regular schedule as [she] has to be reminded to set an alarm, spends many of her days lying down, and avoids going out alone."

In giving little weight to this aspect of Lynch's opinion, the ALJ observed that "Dr. Lynch is only an examining physician who apparently relied quite heavily on the subjective report of symptoms and limitations reported by the claimant and seemed to accept uncritically as true most, if not all, of what [she] reported."  Once again, the ALJ supportably found that Allard's complaints of disabling symptoms were not fully credible, and the ALJ was entitled to take that into account in assessing the validity of a medical opinion based on those same complaints. See, e.g., Martel v. SSA, Comm'r, 2013 DNH 157, 30-32 .  The ALJ was also entitled to rely on the fact (as she did) that Lynch was an examining, rather than a treating, source.  See 20 C.F.R. § 416.927(c)(2)(I).  The ALJ did not err in her consideration of Lynch's view that Allard could not maintain a regular schedule.

Allard also criticizes the ALJ's decision to give "great weight" to the opinion of another state agency psychologist, Dr. Patricia Salt. Based on a review of Allard's medical records as of mid-October 2010, Salt concluded that Allard suffered from bipolar, anxiety, and personality disorders, but only mild or moderate limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. Salt also completed a mental RFC evaluation concluding, among other things, that Allard could perform activities within a schedule, be punctual within customary tolerance, perform at a consistent pace without an unreasonable number of rest periods, and complete a normal 8-hour work day and 40-hour work week without interruption from psychological symptoms.

In giving great weight to Salt's opinions, the ALJ recognized that they were "from a non-examining expert source" but called them "well supported and not inconsistent with the other record evidence." Allard complains that the ALJ "never discusses what Dr. Salt's opinions are or why they are well supported and not inconsistent with the other substantial evidence." The ALJ, however, referred to Salt's opinion (correctly) as a "finding of non-disability"--and, as should be apparent by now, discussed at length in her decision the "other substantial evidence," none of which, in her view, persuasively

14

showed that Allard was disabled by sleep disturbances or other symptoms of her psychological impairments as she claimed.  Again, that finding was supported by substantial evidence.  It is unclear, then, what else the ALJ needed to say to explain why Salt's opinion was "not inconsistent with the other substantial evidence."[7]

Allard also points out that, because Salt's findings were "based on medical evidence current through September 2010," they "failed to include, address or consider [Allard's] additional twelve months of mental health treatment and assessments up through October 2011."  But this argument overlooks the fact that the opinions of both Lynch and Ganem--which, again, Allard faults the ALJ for <u>not</u> adopting--were rendered within two months of Salt's (on December 1, 2010 and December 13, 2010, respectively) and were therefore based on more or less the same temporal universe.  An ALJ does not err by failing to discount an opinion harmful to the claimant as stale when it is of roughly the same vintage as the opinions in the record that are helpful to the

---

[7]Other judges of this court have demanded a more detailed explanation for crediting the opinions of a nonexamining source where "the opinions of the nonexamining physician and claimant's treating physician are [] dramatically different." Mendoza v. Astrue, 2011 DNH 073, 11-12 (McAuliffe, J.); see also Swanburg v. Astrue, 2012 DNH 071, 18 (Barbadoro, J.).  But that is not the case here, where no treating physician has ever found that Allard's symptoms would prevent her from working.

claimant.  See Chapin v. Astrue, 2012 DNH 177, 11-12.  Moreover, Allard does not point to anything in the records of her treatment from October 2010 onward that undermines Salt's opinions; to the contrary, as already discussed, the ALJ supportably found that those records were inconsistent with Allard's claims of disabling symptoms.  The ALJ did not err in relying on Salt's opinions.

As this court has recognized, an ALJ can rely "exclusively on the assessments of non-testifying, non-examining physicians" in adjudicating a claimant's disability, and conflicts between those assessments and other medical testimony "are for the ALJ to resolve."  Morin v. Astrue, 2011 DNH 091, 9-10 (citing Berrios Lopez v. Sec'y of HHS, 951 F.2d 427, 431-32 (1st Cir. 1991) and Tremblay v. Sec'y of HHS, 676 F.2d 11, 12 (1st Cir. 1982)).  Furthermore, "[t]he ALJ decision to resolve that conflict against the claimant should be affirmed if "'that conclusion has substantial support in the record.'"  Id. (quoting Tremblay, 676 F.2d at 12).  For the reasons just discussed, the ALJ's decision readily satisfies that standard here--where no treating physician has ever opined that Allard suffers from disabling symptoms.

3.  **Prior disability determination**

Finally, Allard criticizes the ALJ's handling of the SSA's prior award of SSI benefits to Allard, in January 2009.  In March

16

2009, the SSA had notified Allard that she was in fact not due any such benefits because her income, in the form of child support payments, disqualified her. In her decision, the ALJ reasoned that Allard's reliance on the prior award "was not well placed" because her application at issue at the hearing was "filed more than a year after the [prior] decision" and Salt's opinion that Allard was not disabled was "based upon current evidence, evidence that did not exist until five months after the prior decision."

Contrary to Allard's accusation, then, the ALJ did not "willfully ignore" the prior award of SSI benefits in January 2009. She considered it and found that it did not support Allard's subsequent application for SSI benefits--which, as amended, claimed an onset date of July 2010--due to evidence that had emerged in the interim. Allard does not question this reasoning. Instead, she complains that "before the issuance of the ALJ's decision, and without notice to the claimant," her August 2008 applications for SSI benefits (which resulted in the March 2009 award) "were added to the file," so that she "never had the opportunity to review [this] material prior to the ALJ's decision." But, even putting aside the fact that it was Allard who filed those applications and, presumably, knew what was in

17

them, she does not explain what effect they had on the ALJ's decision (which does not refer to them).[8]

Moreover, the record makes clear that Allard was aware of both the prior award and its discontinuance by the time of the hearing, where her counsel argued that the ALJ should consider the "prior determination" that Allard was entitled to SSI. Again, the ALJ did so, and found that it did not support Allard's subsequent application for SSI. That finding was supported by substantial evidence (again, Allard does not argue otherwise). There was no error in the ALJ's handling of the SSA's January 2009 award of SSI benefits.

---

[8]Allard states that, "if [she] had been given notice of the proposed addition of evidence, [she] would have argued that since the ALJ had access to the prior claims file, the ALJ should have produced the [SSA's] rationale and medical findings in support of its prior finding that the claimant was disabled due to mental illness." The court does not follow this line of argument. As noted infra, Allard's counsel was aware of both the prior award and its revocation by the time of the hearing before the ALJ, but did not ask the ALJ for production of the claims file or any other relief (counsel asked only that the ALJ take the award into consideration which, as just discussed, she did). This court can hardly fault the ALJ for failing to provide a claimant with relief that her attorney could have requested, but did not. See Faria v. Comm'r of Soc. Sec'y, 187 F.3d 621 (table), 1998 WL 1085810, at *1 (1st Cir. Oct. 2, 1998).

For the foregoing reasons, Allard's motion to reverse the ALJ's decision[9] is DENIED, and the Commissioner's motion to affirm the ALJ's decision[10] is GRANTED.  The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  February 21, 2014

cc:  Mark J. Alves, Esq.
     Roger D. Turgeon, Esq.
     Robert J. Rabuck, AUSA

---

[9]Document no. 28

[10]Document no. 31